IN THE UNITED STATES BANKRUPTCY COURT
FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| MANSIONS AT HASTINGS GREEN, LP | § | CASE NO. 10-39474-H3-11 |
| | § | |
| | § | |
| MANSIONS AT HASTINGS GREEN SENIOR, LP | § | CASE NO. 10-39476-H3-11 |
| | § | (Chapter 11) |
| | § | |
| DEBTORS | § | Jointly Administered Under CASE NO. 10-39474-H3-11 |

## ADVERSARY PROCEEDING

| | | |
|---|---|---|
| JAMES FRED HOFHEINZ AND NATIONS CONSTRUCTION MANAGEMENT, INC. PLAINTIFFS | § § § § | |
| VS. | § | ADVERSARY NO. |
| | § | |
| RED CAPITAL MARKETS, LLC, SCDC, LLC, AND JOHN DOES 1-10 DEFENDANTS | § § § § | _____ |

## COMPLAINT

To the Honorable United States Bankruptcy Judge:

Come now James Fred Hofheinz, and Nations Construction Management, Inc., sometimes referred to herein as Plaintiffs and file this original Complaint over and against Red Capital Markets, LLC, SCDC, LLC and John Does 1-10 and for cause of action would show unto the Court the following:

1

## CORE PROCEEDING

**1.** This is a core proceeding affecting the assets and liabilities of the Chapter 11 Estate(s).

## JURISDICTION

**2.** The Court has jurisdiction to consider the claims of this Complaint for Damages and Indemnification pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). The Court has the authority to enter a final order regarding the contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (E), (G), (I), (J) and (O).

## BASIS OF THE ADVERSARY PROCEEDING

**3.** It is the contention of the Plaintiffs that the Defendants, acting individually and as representatives of the corporate Defendants acted jointly and severally to cause Plaintiffs to be exposed to liability and deprived Plaintiffs of an opportunity for financial profit by breaching the agreements creating Mansions at Hastings Green, L.P. and Mansions at Hastings Green Senior, L.P. (hereinafter together the "Mansions Entities"), and by assuming the position of manager of the Mansions Entities and negligently interfering with the proper management of the Mansions Entities. Plaintiffs are Third Party Beneficiaries of those agreements and seek indemnity from the Defendants and money damages.

## DEFENDANTS/SERVICE OF PROCESS

**4.** Defendant Red Capital Markets, LLC is a Delaware limited liability company qualified to do business in Texas. It may be served through its Texas Registered Agent for Service, Corporation Service Company dba CSC-Lawyer's Inco, 211 East 7th Street, Austin, Texas 78701. Red Capital is an investment banking group which, among other things,

specializes in organizing and managing equity funds for investment in real estate projects that qualify for tax credits under United States Tax Code Section 42.

**5.** Defendant SCDC, LLC, (hereinafter "SCDC") is an Ohio limited liability company, apparently not qualified to do business in Texas.  Service on SCDC may be had by service on the Texas Secretary of State. SCDC, LLC is a subsidiary and "alter ego" of Red Capital Markets, LLC and the entity that Red Capital Markets, LLC, uses to oversee the tax-credit-equity funds that are invested as limited partners in both Mansions Entities. (References to "Red Capital" hereinafter are intended to mean Red Capital Markets, LLC and its subsidiary SCDC). SCDC recently asserted its rights to replace the Managing Member of the General Partner of both Mansions Entities, and, once having done that, filed the voluntary bankruptcy petitions that are before this Court.

**6.** Defendants John Does 1-10 will be further identified as discovery progresses in this matter and service will be effected as the John Does are identified.

## PLAINTIFFS

**7.** Plaintiff Nations Construction Management, Inc. (hereinafter "Nations") is a Texas Corporation and is contractor in the business of constructing multifamily, residential properties. Plaintiff James Fred Hofheinz (hereinafter "Hofheinz") is an individual residing in Texas and a business man who has in the past invested in real estate projects constructed by Nations. Nations and Hofheinz have executed and delivered certain guarantees for the completion of the projects and payment of the Mansions entities' debts.

## FACTS

**8.** The partnership agreements forming the Mansion Entities were signed on July 17, 2007 (hereinafter the "Agreements"). They were formed for the purpose of constructing two affordable housing apartment projects, Mansions at Hastings Green with 230 units

and Mansions at Hastings Green Senior with 252 units (hereinafter, together, the "Projects"). The Projects were to be constructed simultaneously, side by side at a location in Northwest Houston. The Agreements estimated the cost to construct Mansions at Hastings Green to be $24,440,701 of which $14,000,000 would be debt and $8,608,838 would be equity; and the cost of Mansions at Hastings Green Senior to be $23,442,941 of which $13,200,000 would be debt and $8,336,315 would be equity. While they were separate Projects, they were both financed in the same manner: The debt was provided by the issuance and sale of bonds by the Harris County Housing Finance Corporation and the equity by investors who received Federal Tax Credits pursuant to Section 42 of the Internal Revenue Code as an inducement for the investment.  The equity was provided by two separate tax credit funds managed by Red Capital (hereinafter the "Equity"). The bonds were purchased in both projects by Citibank, N.A. which in the process acquired a first mortgage position in both projects.  Construction began on the projects around August 1, 2008 and both had been successfully completed. Both projects are considered by all concerned to be of good if not exceptional quality and are over 95% occupied

**9.** Financing agreements between the Mansions Entities and Citibank, N.A. were signed on the day the Agreements were signed. Those agreements provided, in part, that Citibank would convert its Harris County Housing Finance Corporation bonds into a permanent first mortgage loan on each of the Projects at the point in which each Project, separately, had 90% occupancy for a period of six consecutive months, and had enjoyed net income equal to 115% of the funds necessary to service its first mortgage loan and maintained that level of income for a period of ninety (90) days (the "Conversion Goal"). This was a firm obligation of Citibank N.A. but it was subject to a deadline. If the Conversion Goal did not occur before August 1, 2010 then Citibank would no longer be obligated to convert the bonds. Because of the delays and other matters hereinafter described, neither Project reached the Conversion Goal before the deadline. Citibank, relieved of its obligation to convert, decided to exercise its rights in the financing agreements and demanded that Red Capital refinance the bonds and pay back Citibank, N.A. its investment. When Red Capital, for whatever reason, refused or was unable to do so, Citibank N. A. posted both Projects for foreclosure.

**10.** In July, 2007, Nations and Hofheinz were induced by the Robert R. Burchfield Group (hereinafter "Burchfield Group") and Red Capital to guarantee the successful completion and financial stability of both Projects. The Burchfield Group was the developer of the Projects and the Managing Member of the General Partner of both Mansions Entities. The guarantee provided by Nations and Hofheinz included a guarantee of The Mansions Entities and Red Capital's tax shelter funds against claims of Citibank N.A. All the guarantees in question are contained in two agreements executed by the guarantors on the same date as the Agreements. They are titled "Guaranty of Obligations of Equity General Partner" and "Completion Guarantee" (hereinafter, together, the "Guarantee."). Nations agreed to provide the Guarantee because it was chosen by Burchfield to be the general contractor on both Projects and it anticipated profits. In addition Nations and Hofheinz agreed to provide the Guarantee because both were given an interest in the developer's profits in exchange for the Guarantee (all aforesaid profits hereinafter "Profits"). As a result of the Guarantee provided and their interest in the profits of the Projects, Nations and Hofheinz are Third Party Beneficiaries of the Agreements.

## CAUSES OF ACTION

### Breach of Contract

**11.** Plaintiffs aver that the failure of Red Capital to timely contribute the Equity promised in the Agreements to the Mansions Entities caused delays in the construction and rent-up of the Projects. Those delays caused the Mansions Entities to miss the Citibank, N.A. deadline thereby triggering the Citibank posting of foreclosure and the voluntary petition for bankruptcy. Thus the plaintiffs were exposed the Plaintiffs to liability arising from their Guarantee and deprived of their anticipated profits. Among other things it caused Nations to be unable to pay its sub-contractors who are still owed combined in the two projects the sum of $784,445. Several of those sub-contractors filed Mechanic's and Materialman's liens on the Projects and most of those sub-contractors declined to do

additional work for Nations on other projects thus affecting negatively its reputation and business.

**12.** Under the terms of the Agreements (Article IV, Section 4.1), Red Capital was to make specific Equity contributions to the Mansion Entities in four installments. By March, 2009 it had made only the first installment which for the two projects totaled $4,236,236. Separately, before March, 2009 Red Capital had arranged for "bridge loans" to be made to the Mansions Entities totaling $8,758,675. Before March, 2009 Citibank N.A. had purchased the bonds and contributed $27,200,000 of proceeds to the Mansions Entities. So, by March, 2009 the total funds provided by Red Capital and Citibank N.A. were $40,194,011 for two Projects against estimated total costs of $47,883,642 This created a shortfall of $7,689,631,00 in Red's obligation to the Mansions Entities.

**13.** The March, 2009 date is important because it was in that month that Red Capital arbitrarily ceased to make agreed-upon Equity investments in either Mansions Entity and thereby put the Projects in jeopardy. On information and belief we would show that Red Capital's support for the Projects diminished when, at the end of 2008, Red Capital's parent, National City Corp, was purchased by PNC Bank. Immediately following the purchase, PNC Bank announced that it was putting Red Capital up for sale. Published reports and the testimony of former officers of Red Capital will establish that PNC Bank was concerned about Red Capital's balance sheet and that it would not give Red Capital any financial support. PNC Bank was the parent of Red Capital for approximately 18 months until PNC Bank sold it to a group of Red Capital insiders in May, 2010. Discovery will show that during the 18 month period in which it was controlled by PNC Bank that Red Capital was stressed for capital and its various investments and responsibilities suffered. The capital squeeze caused Red Capital to dismiss a number of key employees including some who were working closely with the Mansions Entities before they were terminated. Plaintiffs contend the Mansions Entities were victims of Red Capital's financial circumstance and its failure to meet their responsibilities defined in the Agreements. Beginning in March, 2009 routine applications by the Mansions Entities for Equity installments due under the agreements were ignored without

explanation. These funds were vital to the ultimate completion and lease up of the Projects. The electronic e-mail evidence and personal testimony will show that the Mansions Entities were repeatedly given assurances by officers and agents of Red Capital that the draws would ultimately be approved and paid, but no payments were ever received. The Mansions Entities relied in good faith on those representations and made adjustments in management in anticipation that the representations were true and that funding would ultimately come. The evidence will also show that officers of Red Capital actually approved the funding requests and asked their superiors for funding which was never forthcoming. Plaintiffs will show that Red Capital's denial of draw requests occurred in the critical final stage of the development of the Projects and caused delays in construction, delays in warranty repair work, and delays in marketing of the units all of which led to the inability to meet the Citibank Conversion Deadline.

**14.** Plaintiffs would show that the last funding request paid by Red Capital was in March 2009. But while funding requests were not being honored, Red Capital, unilaterally, on its own initiative, after a long delay, began to pay certain items of its choosing while ignoring the payment of other critical items. In the fall of 2009 Red Capital paid Citibank N.A. $260,117 in back interest; it paid itself $8,758,675 to retire the "bridge loan"; and in the Spring of 2010, long after the damage done by the delay had become irreparable, Red Capital paid selected Mechanic's and Materialman's Liens of its own choosing in the amount of $556,948 and made a contribution to the operating reserve of one of the Projects in the amount of $250,000. All in all, by April 2009, the total investment made by Red Capital in the two Projects was $14,077,331. The total Equity promised by Red Capital to the two Mansion Entities combined was $16,950,209, a shortfall of $2,867,822. Meanwhile, the Projects were completed by use of cash from apartment unit rentals and by the extension of credit by Nations' sub-contractors.
.

**15.** The suspension of Equity payments by Red Capital caused the Mansions Entities to miss the Conversion Deadline. For lack of funds Nations was forced to slow down construction and the Mansions Entities had inadequate resources to market the rental units. The resulting slow pace of "rent ups" carried the Projects over the Citibank N.A.

7

deadline and resulted in the posting for foreclosure by Citibank. Plaintiffs would show that the failure of Red Capital to perform under its obligations in the Agreements has caused them economic damages and exposure to liabilities they would not otherwise have been exposed to.

### Negligence

**16.** Plaintiffs aver that Red Capital took control of the Mansions Entities and violated its duty to properly manage the Projects by negligently administering the affairs of the Mansions Entities in a way that made the long-term financing of the Projects more difficult thus depriving Plaintiffs of profits and subjecting the Plaintiffs to liability by and through their Guarantee. On July 27, 2010 Red Capital asserted its rights under the Agreements to replace the Burchfield Group as manager of both of the Texas limited liability companies that are the General Partners of the Mansions Entities and install SCDC in its place, thus taking direct control of both Mansions Entities (hereinafter the "Takeover"). By removing the Burchfield Group and placing itself in position as the sole manager, SCDC assumed the duty and responsibility of making proper and responsible decisions for the Mansion Entities. SCDC was at all times herein acting as an agent of its principal Red Capital Markets, LLC.

**17**. Plaintiffs aver that the Defendants knew or should have known that the removal of the developer would in all likelihood create problems for the Mansions Entities because the developer, the Burchfield Group, conceived the Projects, hired the architects, negotiated the original financing, hired the contractor, and had been involved in all aspects of both Projects from the beginning. At the time of the Takeover, testimony will show that the Burchfield Group was co-operating fully with Red Capital to find a solution to Citibank N.A. demands. Plaintiffs would show that the Takeover, taken as a single event, was a violation of the duty of care to properly manage the Projects. Suddenly at a critical time in the workout with Citibank, NA, with other issues to be addressed, third parties were faced with a new name and face for the Mansions Entities. At the same time the Burchfield Group was asked by Red Capital to stay away from the Mansions' contacts.

18.  At the time of the Takeover the Mansions Entities were in the final stages of litigation with the Harris County Appraisal District (hereinafter "HCAD") regarding the tax evaluation of the Projects. The tax value litigation had been going on for months and was nearing a climax due to an impending trial date, only weeks away. Plaintiffs aver that Defendants knew or should have known that tax appraisal litigation in Harris County is the accepted and usual method of challenging and modifying the tax appraisal district valuations of properties and that adjustments are not usually forthcoming until the "last minute" and on the Court House Steps, In the litigation the Mansions Entities were represented by competent counsel and were being advised by that counsel that substantial concessions by HCAD would be made at or near the trial date. Plaintiffs will provide expert testimony that those savings could have been as much as $200,000.00 for the two years in question and many thousands more in subsequent years. Following the Takeover the Defendants, unilaterally, and Plaintiffs would aver negligently, caused the litigation to be dismissed thereby costing the Mansions Entities thousands dollars in ad valorem taxes that otherwise would not have to be paid. Such a loss diminished the value of the Projects and made their long-term financing more problematical and thereby subjected Plaintiffs to liability by and through the Guarantees. The rational for the dismissal given by Red Capital was that the expense of the litigation would not justify the reward, which is spurious inasmuch as the attorney representing the Mansions Entities was working on a modest fixed fee basis and little if any further costs would be incurred.

19.  One of the Mansion Entities had negotiated a Memorandum of Understanding with the Harris County Housing Authority (hereinafter HCHA") wherein HCHA was proposing to purchase that Project owned by that Entity. Because HCHA is a government unit exempt from paying ad valorem taxes if it were to purchase the Project in question there would be no ad valorem taxes assessed. Such a move would assure the financial stability of that Project for years to come and serve a good public purpose in the process. Red Capital was aware of the proposed Memorandum of Understanding because the draft of same, which had been created by HCAD, had been submitted to Red Capital by the Burchfield group for approval. Plaintiffs will show written evidence that HCHA was

prepared to sign the Memorandum of Understanding which was shown to the Defendants. But instead of approval Red Capital, in violation of its duty of care to the Plaintiffs to properly manage the Properties, attempted to deal with the Housing Authority absent the Burchfield Group that had negotiated the Memorandum of Understanding. Plaintiffs allege that the Defendants knew or should have known that substituting themselves for the Burchfield Group in the HCHA transaction would put it in jeopardy. In fact, the evidence will show that the Defendants were warned before the Takeover that any involvement on their part at the HCHA would threaten the proposed transaction. Failing to heed that advice, the Defendants approached the HCHA and the result was that HCHA, without explanation, withdrew its offer. Plaintiff's would aver that Red Capital's independent approach to the Housing Authority was clumsy and negligent, violated Defendants' duty to provide Plaintiffs with proper management, and ruined a golden opportunity negotiated by the Burchfield Group which would have made the Project financially secure for the long term and made it simple to re-finance the bonds held by Citibank, N.A. Plaintiffs aver that such negligence deprived Plaintiffs from Profits resulting from financially stable Projects and exposed Plaintiffs to liabilities by and through their Guarantee.

### PRAYER

**20.** The Plaintiffs pray the Court to enter Judgment over and against the Defendants, jointly and severally, for the value of the Profits taken from them when the Citibank N.A. Conversion Deadline was not met and/or when the prospects for refinancing the entirety of the bonds held by Citibank were diminished as a result of the Defendant's negligence, as well as indemnity from any and all claims made against them by and through the Guarantees.

**21.** It was necessary for the Plaintiffs to engage counsel to protect their interests in these Projects. They have engaged O. Otis Bakke, an attorney licensed to practice law in the State of Texas and the United States District Courts for the Southern District of Texas, to

represent them in this matter. Plaintiffs pray that they be awarded the usual, reasonable and customary fees for an attorney to represent them in a matter of this kind.

**22.** Plaintiffs pray for costs of court and for pre-judgment and post judgment interest on all funds awarded by the court and for all other relief, legal and equitable, general and special to which they may show themselves entitled.

>Respectfully submitted,
>
>/s/ O. Otis Bakke
>
>O. Otis Bakke
>Attorney for Plaintiffs
>TBA# 01609000
>1272 Handkerchief Way
>Haslet, Texas 76052
>(817) 437-1729  Telephone
>(817) 439-1322  Facsimile
>*otisbakke@sbcglobal.net*